Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **Priscilla A. Haddad, and** | ) | |
| **Ronald A. Haddad** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | **Judge:** |
| **American Home Mortgage Servicing, Inc.;** | ) | **Magistrate Judge:** |
| **Ocwen Loan Servicing, LLC;** | ) | |
| **Ocwen Financial Corporation;** | ) | |
| **Homeward Residential Holdings, Inc.;** | ) | |
| **Option One Mortgage Acceptance** | ) | |
| **Corporation;** | ) | |
| **Option One Mortgage Corporation;** | ) | |
| **H & R Block Mortgage Corporation;** | ) | |
| **H & R Block, Inc.;** | ) | |
| **Ada Services Corporation; and** | ) | |
| **Sand Canyon Corporation** | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

NOW COMES the Plaintiffs Priscilla A. Haddad (Priscilla) and Ronald A. Haddad (Ronald), collectively referred to herein as "the Plaintiff" or "the Haddads", by and through their attorneys of LOGIK Legal LLC, stating as follows:

<u>INTRODUCTION</u>

1. This Complaint is commenced by the Plaintiffs for redress against the named Defendants.

2. This Complaint is filed against the named Defendants for their violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq*.

3. The Plaintiffs seek monetary damages for the Defendants violation of the RICO conspiracy provision pursuant to 18 U.S.C. § 1962(c) and (d) ("Counts I & II"), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") 815 ILCS 505/2 *et. seq*,

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

(Count III); Civil Conspiracy (Count IV) and Intentional Infliction of Emotional Distress ("Count V").

<u>JURISDICTION</u>

1.      This Court has jurisdiction to grant the relief sought by the Plaintiffs pursuant to 28 U.S.C. §§ 1331, 1334, 15 U.S.C. § 1640 *et seq.*, and 12 U.S.C. §§2602, 2607 and 27 U.S.C. 1964.

2.      The Court has supplemental jurisdiction over the Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper pursuant to 28 U.S.C. §§1391(b), 1394, 1395(a), 1408(l), 1409, and 1411, where the real estate interest of Plaintiff is located at 126 Park Avenue, River Forest, Cook County, Illinois (the Property) is the subject of this proceeding and the Property is situated in this District. Venue lies in this District pursuant to the provisions of 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) in that Defendants have transacted business of a substantial and continuous character in this District, Defendants are subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to these claims occurred in this District. Additionally, the ends of justice require that Defendants be brought before the Court pursuant to 18 U.S.C. § 1965(b).

4.      This Court has jurisdiction over the named Defendants for the causes of action asserted herein arise from and is connected to the named Defendants transaction of business in this State.

<u>PARTIES</u>

1.      The Plaintiffs, Priscilla A. and Ronald A. Haddad, are natural persons residing in the state of Illinois within this Court's jurisdiction.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

2.      Defendant H&R Block, Inc. (H&R Block) is a Missouri corporation with its headquarters located at One H&R Block Way, Kansas City, Missouri 64105.

3.      Defendant Option One Mortgage Corporation (Option One) is a California corporation headquartered in Irvine California. Option One is an indirect wholly owned mortgage banking subsidiary of H&R Block. Between the years 1993 – 2008 Option One was in the business of originating, sponsoring, selling, and servicing subprime mortgage loans through a network of brokers and lenders. In 2008 Option One changed its name to Sand Canyon Corporation (Sand Canyon) and sold its servicing business.

4.      Defendant Option One Mortgage Acceptance Corporation (Option Acceptance) is a Delaware corporation and subsidiary of Option One, with its principal place of business at 3 Ada Road, Irvine California 92618.

5.      In 1997 Defendant H&R Block acquired Defendant Option One.

6.      In 1999 Defendant H&R Block acquired Assurance Mortgage Corporation of America (AMCA), which was New England's largest independent mortgage banker for both conventional and government loans.

7.      H&R Block joined Option One and AMCA to form Defendant H & R Block Mortgage Corporation (HRMC) which is a subsidiary of Sand Canyon, with its principal place of business located at 3 Burlington Woods, Suite 2, Burlington, Massachusetts, 01803-4514.

8.      Defendant H&R Block sold Option One's mortgage loans to Defendant American Home Mortgage Servicing, Inc.

9.      Defendant Ocwen Loan Servicing, LLC (Ocwen) is a Florida entity and a financial institution with its principal place of business located at 1661 Worthington Road, Suite

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

100, West Palm Beach, Florida 33146. Defendant Ocwen's Illinois registered agent is

Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

10.     Defendant Ocwen Financial Corporation (Ocwen Financial) is the umbrella corporation

for Ocwen, NMLS# 1852; Ocwen Mortgage Servicing, Inc., NMLS# 1089752; and

Homeward Residential, Inc., NMLS# 3984. Ocwen Financial headquarters is in West

Palm Beach, Florida.

11.     Defendant Homeward Residential Holdings, Inc. (Homeward), formerly known as

AHMSI Holdings, Inc., a Texas corporation, is a wholly owned subsidiary of Ocwen

Financial with its principal place of business located at 1525 S. Belt Line Road, Coppell,

Texas 75019-4913.

12.     Defendant American Home Mortgage Servicing, Inc. (AHMSI) is a Delaware corporation

with its corporate headquarters located at 1525 South Beltline Road, Coppell, Texas.

AHMSI changed its name to Homeward Residential, Inc. in February 2012 and was

acquired by Defendant Ocwen in October 2012.

13.     Defendant Ada Services Corporation (Ada), formerly also known as HRMC, AMCA, and

Option One, was founded in 2010 and is located at 7595 Irvine Center Drive, Suite 100,

Irvine, California 92618.

14.     Defendants Sand Canyon and Ada are wholly-owned subsidiaries of Defendant H&R

Block.

15.     Security Connection, Inc. is an Idaho corporation with its principal place of business

located at 240 Technology Drive, Idaho Falls, Idaho 83401.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

<u>FACTUAL ALLEGATIONS</u>

***<u>Facts related to securitization</u>***

1.     Securitization is the pooling together of mortgage loans into one financial investment instrument known as a Mortgage Backed Security (MBS). The pooling together of residential MSBs are known as residential mortgage backed securities (RMBS).

2.     MBS's and RMBS's are issued based upon the income stream anticipated and generated by monthly mortgage payments from pooled mortgages and are then sold to investors through certificates. The investors are certificate holders.

3.     The certificates are referred to as mortgage pass-through certificates because the cash flow from the pool of mortgages are passed through to the certificate holders when the borrowers make payments on the pooled mortgage loans.

4.     These pooled mortgage loans are held in a trust for the benefit of the investors.

5.     The illustration below illustrates the securitization process:



Source: WSJ Reporting

    a)     **Borrower**: gets financing to purchase a home or refinance a loan.

    b)     **Broker**: gets fees for doing the preliminary sales and paperwork.

    c)     **Lender**: gets up front fees for making the loan. The lender may be forced to take back the loan.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

    d) **Investment Bank**: collects fees for packaging the loans into bond deals. The investment banker may also try to force the lender to take back the loan in case of default or otherwise be forced to eat any losses.

    e) **Investors**: earn interest on the bonds and absorb any gains or losses. The investors may have legal recourse against the bank if they can show the quality of the bonds were misrepresented. Hundreds of investors have filed suit against lenders.

6.     The broad framework of all mortgage trust typically includes the following entities:

    a) **Issuing Entity**, which is the trust.

    b) **Depositor**, which is the party responsible for transferring assets, the mortgage loans, into the trust by indorsing and assigning the loans to the trust.

    c) **Sponsor, Originator, or Servicer**, which is the party responsible for selling all rights and interest in the mortgage loans to the Depositor for depositing the mortgage loans into a trust. It also has the administrative duty of handling the mortgage loans in the trust which involves a number of task, including but not limited to, collecting mortgage loan payments from borrowers, distributing payments to trust certificate holders, administrating escrow accounts, providing required notices to borrowers, handling all verbal and written communications with the borrower, and other duties as set forth in the Truth In Lending Act (TILA) and the Real Estate Settlement and Procedures Act (RESPA).

    d) **Master Servicer, Trust Administrator, or Custodian**, which is the party responsible for all duties described above in (c) and in supervising other servicers.

    e) **Trustee** which is the party only in name who represents the trust and has a fiduciary duty to the trust certificate holders.

7.     The Sponsor or Originator is responsible for selling mortgage loans to the Depositor.

8.     The final step in placing assets into the trusts is to convey the mortgage loans into the trust.

9.     When mortgage loan payments are collected by the Servicer, those payments are to be distributed to the trust beneficiaries, called certificate holders in the trust.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

10.    The Servicer is responsible for ensuring its servicing practices are in conformance with those of prudent mortgage lending institutions that service similar mortgage loans.

11.    The Master Servicer has servicing agreements with other servicers, for those other servicers, Sub-Servicers, to service the mortgage loans that are in the trust.

12.    The fundamental value of the certificates held by the certificate holders is based upon the ability of borrowers to repay the mortgage loans as well as the value of the collateral for those loans.

13.    For this reason, the representation of the quality of the loans and value of the collateral is critically important.

14.    In securitization markets, basic standards were ignored. Instead mortgage originators and lenders abandoned underwriting standards, allowed pervasive and systematic exceptions to their underwriting standards without proper justification, outside of greed; adopted practices that significantly varied from the norm and their stated underwriting practices; disregarded credit risk; disregarded quality control in favor of generating loan volume which increased their profits at the detriment of the borrowers and the investors; pressured and at times even coerced appraisers to inflate the value of the underlying collateral; and engaged in predatory lending practices; all for purpose of making more money at any expense.

15.    This was a fundamental shift in the securitization markets.

16.    This shift proved to be highly profitable in the short term for the mortgage originators. By shifting to securitization and selling of mortgages to investors, the originators shifted the loans off their books so their financial position looked better in paper, earned immediate upfront fees which encouraged originators to issue more loans, regardless of loan quality.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                     Case No.

17.     This shift also allowed originators to earn significant loan servicing fees which further created an unchecked incentive to originate more loans, regardless of loan quality.

18.     This created a flawed compensation practices that permeated Wall Street financial markets led by greed as has been discovered by numerous reports and testimony. Sheila C. Bair, Chair of the FDIC in her testimony before the FDIC.[1]

### _Facts related to the Servicers Handling & Treatment of Securitized Mortgage Trusts_

19.     Option One established securitized mortgage trusts for selling RMBS to investors. Option One sponsored each trust and originated and serviced the mortgage loans contained in each trust.

20.     Option One was one of this country's largest subprime lenders.

21.     In its fiscal year of 2006, Option One originated nearly $40 billion in subprime mortgage loans.

22.     Option One originated subprime loans and sold them in the secondary market through RMBS securitizations or whole loan pool sales which are sales of an entire pool of subprime mortgage loans to a single purchaser.

23.     Option One funded its mortgage originations using credit lines, commonly referred to as Warehouse Lines which are provided by financial firms commonly referred to as Warehouse Lenders.

24.     Warehouse Lines are short-term revolving credit facilities that Option One used to originate new subprime mortgages.

---

[1] Attorney General of Massachusetts Report, _The American Dream Shattered: The Dream of Home Ownership and the Reality of Predatory Lending_. SEC v. Mozilo, et al., No. 09-3994 (C.D. Cal.), Declaration of Paris Wynn.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

25.     When Option One sold the mortgages, it originated in a RMBS securitization or a whole loan pool sale, it used the proceeds to pay down the balances on its Warehouse Lines.

26.     Option One received more money for its mortgages by engaging in RMBS securitizations rather than whole loan pool sales.

27.     The RMBS securitizations were an integral part of Option One's business.

28.     The Warehouse Lenders also acted as loan underwriters for Option One's RMBS securitizations, including the securitizations of the Trusts.

29.     Option One's RMBS were debt obligations that represented claims to the cash flows from pools of residential mortgage loans. When securitizing a pool of subprime mortgages, Option One utilized a series of wholly owned subsidiaries and trusts. First, Option One, through its subsidiaries, sold the loans into a trust. That trust then issued RMBS that represented claims on the principal and/or interest payments made by borrowers on the loans in the pool. A RMBS investor's risk and return were functions of the tranche, or class of RMBS within the trust *(e.g.,* senior/mezzanine/subordinated), that the RMBS investor purchased. Each tranche had its own credit rating

30.     In connection with each of the trusts, Option One and its subsidiaries execute Mortgage Loan Purchase Agreements (MLPA) which are required to close the trust, and which memorialized both the terms of the sale of the mortgage pool for securitization and the representations and warranties governing the loans. In the MLPA, which were referenced in the prospectuses SEC Forms 8K that an Option One subsidiary, Option Acceptance filed with the SEC on behalf of each trust, Option One represented that it did not have any reason or cause to believe that it could not perform the covenants set forth in the MLPAs. The MLPAs provided that Option One shall repurchase or replace those

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

mortgage loans collateralizing the trusts for which there were breaches of a representation or warranty that materially and adversely affected the value of the loans or the RMBS investors' interest in the loans.

31.     Option One's fiscal year runs from May 1 to April 30 with quarters ending on July 31, October 31, January 31, and April 30.

32.     In 2006 Option Mortgage was one of the country's largest subprime originators.

33.     Options subprime market began to decline experiencing losses and revenue declines in the spring/summer of 2006, including pretax losses of approximately $5 million and $40 million in first and second quarters of fiscal year 2007 that ended on July 31, 2006 and October 2006 respectively.

34.     In response to these losses, Option One tightened its loan origination underwriting standards in August 2006, December 2006, January 2007, February 2007, and March 2007 by, among other things, requiring prospective borrowers to have stronger credit profiles.

35.     On November 6, 2006, H&R Block lowered its fiscal year earning by over 20% and announced Option One was closing 12 branch offices in its Form 8-K filed with the SEC.

36.     H&R Block negotiated a possible sale of Option One between December 2006 and April 2007 but continued to maintain its Warehouse Lines.

37.     On March 16, 2007 Standard & Poor credit rating agency placed H&R Block on its credit watch with negative implications.

38.     On April 19, 2007 H&R Block announced its agreement to sell Option One for $300 million less than its tangible net asset value in its Form 8-K filed with the SEC.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

39.     From 2001 to 2007, H&R Block and HRMC's subprime retail originations represented approximately 10% of Option One's overall loan origination volume.

40.     When Option One did not originate a mortgage loan, H&R Block, its subsidiary, provided a line of credit for Option One to have immediate access to funds. This Line of Credit provided an interest rate of one-month LIBOR plus 250 basis points. The Line of Credit agreement required funding of only $150 million of borrowings. Borrowings above $150 million under the Line of Credit were dependent on Block's ability and willingness to provide Option One with the necessary cash because Block was under no obligation to do so.

41.     Option used the Line of Credit to fund its operating activities.

42.     On April 24, 2012, the United States Securities and Exchange Commission (the SEC) filed suit in the United States District Court of California against Option One for violations of federal securities laws related to Option One's fraudulent sale of residential mortgage-backed securities. *See* United States Securities and Exchange Commission v. Option One Mortgage Corporation n/k/a Sand Canyon Corporation, 12 C 633, C.D. Cal., April 24, 2012.

43.     In the above-mentioned case, the SEC demanded that the court enjoin Option One, and its claimed affiliate Sand Canyon from further violations, and disgorge Option One of all ill-gotten gains from its improper conveyances of residential mortgages. Id.

44.     At said time, Sand Canyon agreed to pay $28.2 million to settle the SEC's charges against them.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

45.     In 2008, conveniently just before the State of California ordered Option One to cease and desist its mortgage lending and servicing business, Sand Canyon began claiming some affiliation with Option One.

46.     On April 30, 2008, just four months before California ordered Option One to discontinue mortgage servicing altogether, Sand Canyon, through H&R Block claimed to sell all of Option One's mortgage loans and mortgage loan servicing business to AHMSI.

47.     Therefore, at that time Sand Canyon ceased to own any residential real estate mortgages or engage in the servicing of residential mortgage loans.

48.     If Sand Canyon or H&R Block had any control over Option One's mortgages at that time, then it acquired the Plaintiffs loan in 2006, in opposition to allegations of the Trust and the Assignment.

49.     Sand Canyon re-alleged the above in the allegations of its February 22, 2012 complaint in New York state court against American Home for breach of the transfer agreement. Paragraph 24 of Sand Canyon's complaint states: "Option One ceased originating loans at the end of 2007 and sold its loan servicing portfolio to [American Home] pursuant to a Purchase Agreement dated March 17, 2008 . . . which became effective April 30, 2008. *See* Sand Canyon Corporation v. American Home Mortgage Servicing, Inc., No. 650504/2012, NY Cty (Feb. 22, 2012).

50.     On May 29, 2012 AHMSI changed its name to Homeward.

### *Facts related to the Option One Mortgage Loan Trust Series 2006-2*

51.     Pursuant to public documents filed with the Securities and Exchange Commission (SEC), which this Court may take notice and the Plaintiffs request that this Court takes judicial notice, on June 1, 2006 the Option One Mortgage Loan Trust Series 2006-2 (the Trust)

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

was established pursuant to the Trust Pooling and Servicing Agreement (PSA). A true

copy of relevant pages of the PSA is attached herein as Exhibit 'A'.

52.   Pursuant to the PSA Wells Fargo Bank, N.A. (Wells Fargo), a national banking

association, is the Trustee of the Trust. Id. at § 1.01.

53.   Option Acceptance is the Depositor of the Trust, the party responsible for transferring the

Loan into the Trust. Id. at § 1.01.

54.   Option One is the Master Servicer and the Originator of the Trust. Id. at § 1.01.

55.   Option One established the Trust for selling RMBS to investors. Option One sponsored,

originated, and serviced Trust.

56.   The Trust cut-off date for mortgage loans being accepted into the Trust was June 1, 2006.

Id, § 1.01.

57.   The Trust closing date was June 29, 2006. Id.

58.   The Depositor is the only party that can transfer and assign mortgage loans into the Trust

to the Trustee and such transfers of mortgages must contain indorsements evidencing the

full chain of title. Id. at § 2.01.

59.   The Depositor received its interest in mortgage loans from the June 23, 2006 *Mortgage

Loan Purchase Agreement* (Purchase Agreement). Id., at Ex. C.

60.   The Purchase Agreement provides that Option Acceptance purchased mortgage loans for

the Trust from the Seller of the mortgage loans which is Option One and nine Seller

Trusts. Id., at Ex. C.

61.   The Trust is a Real Estate Mortgage Investment Conduit (REMIC) pursuant to the

Internal Revenue Code (IRC) and is governed by and subject to the laws of the state of

New York. Id. at § 1.01, 2.09, 9 and 11.4.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                                   Case No.

62.     As such the Trust's authority is limited by the REMIC provisions of the IRC.

63.     The Trust itself is a mortgage securitization trusts in which the Trust securitized classes
        of mortgages and sold them to investors. Id.

64.     Option One services and administers the loans in the Trust. Id. at § 3.01.

65.     Option One enters agreements with Servicer, also referred to as Sub-Servicers. Id. at § 3.

66.     Regardless of any agreements between the Master Servicer and Sub-Servicers, the Master
        Servicer retains the liability and remains obligated to service and administer the Loan. Id.
        at § 3.04.

67.     Pursuant to the PSA, the Trust does not have any directors, officers, or other employees.
        Instead, all parties acted through and at the direction Option One.


### _Facts Related to the Plaintiffs' Mortgage Loans_

68.     On or around September 14, 1987 the Plaintiffs secured their interest in the Property and
        resided in the Property since such time until they were foreclosed upon, with Ronald
        leaving the Property at least two years prior to Priscilla leaving the Property.

69.     On or around February 23, 2005 Plaintiffs secured a mortgage through H&R Block
        pursuant to solicitations from Wells Fargo (Loan I).

70.     One year later, the Plaintiffs began receiving continual telephone solicitations from Josh
        of Wells Fargo, continually informing the Plaintiffs that they can refinance the Property
        and secure over $400,000 to help with all their expenses.

71.     At the time, Ronald was suffering from a significant financial loss. Ronald was self-
        employed for decades running a small business for classified news advertisements. The
        increased use of the internet caused a significant decrease and eventually the collapse of
        Ronald's business.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

72.    At that time, the Plaintiffs also had tax debt with the IRS of approximately $375,000 due to Ronald's business back taxes.

73.    Josh of Wells Fargo informed the Plaintiffs that the Property was worth $750,000, substantially more than the $87,000 fair market value of the Property when Plaintiff's acquired the Property.

74.    During this time, though both Ronald and Priscilla were working and had income, the Plaintiffs credit history was poor and declining due to Ronald's reduced income which caused a spiraling effect on the Plaintiffs ability to make timely payments on other debts and obligations.

75.    In response to the solicitations mentioned in the preceding five paragraphs and considering the Plaintiffs financial struggles, the Plaintiffs submitted financial documentation to Josh as Josh requested.

76.    The Plaintiffs income at the commencement of Loan I was $17,997.

77.    At that time, the Plaintiffs monthly mortgage payment on Loan I was $1400.

78.    At that time, Loan I was serviced by Option One.

79.    At that time, Option One was aware of the Plaintiffs financial difficulties pursuant to the Plaintiffs telephone communications with Option One's telephone representatives regarding Loan I, which was made with H&R Block and serviced by Option One.

80.    As such, there was no coincidence that the Plaintiffs were targeted and solicited by the Enterprise for the making of Loan II.

81.    On March 4, 2006, the Plaintiffs refinanced Loan I and secured a mortgage loan through H&R Block again, in the amount of $470,000 with an initial interest rate of 6.5% and

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

initial monthly payment of interest and principal of $2,970.72 (Loan II). See Exhibit 'B' as attached herein.

82. The Loan II payment was $1,570.72 more than Loan I, which more than doubled the Loan I payment.

83. Loan II was an adjustable rate loan, which adjusted on May 1, 2008.

84. At the adjustment, the monthly mortgage payment increased to $3,667.16 in principal and interest, for a total monthly payment of $4,617.89 with the Loan II escrow account for property taxes and property insurance. This increased the Loan II monthly payment by almost $700. See Exhibit 'C' as attached herein.

85. This adjusted Loan II payment was $2,267.16 more than the Loan I payment.

86. The increased monthly mortgage payment was unreasonable considering the Plaintiffs income at the time and considering that nothing in the income information the Plaintiffs had provided to Josh and to H&R Block to secure the Loan provided the Plaintiffs had any means to pay $4,617.89 per month on Loan II.

87. Furthermore, there could be no real expectation of repayment by the Plaintiffs considering the Loan II adjusted payment was $200 more than the Plaintiffs' monthly income.

88. Based upon the assumption that Option Acceptance sold and deposited Loan II into the Trust pursuant to the terms of the PSA, making it a viable loan, Plaintiffs began making payments to the Trust through the Servicer Option One.

89. Since its inception, the Loan has been serviced by AHMSI, Option Mortgage, Ocwen, Sand Canyon, and Ada Services, collectively referred to herein as the "Servicers".

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

90.     The Servicers were operating under the guidance and supervision of the Master Servicer, Option One. Therefore, any reference to the Servicers - AHMSI, Option Mortgage, Ocwen, Sand Canyon, and Ada Services) shall also include the Master Servicer, Option One.

91.     Per the PSA, when the Servicers collected mortgage loan payments from the Plaintiffs, the Master Servicer purportedly transferred those payments to each trust beneficiaries, the Certificateholders.

92.     Therefore, the Trust is primarily administered by the Master Servicer, Option One.

93.     On December 8, 2008 Wells Fargo, as Trustee for the Trust, commenced a foreclosure action against Plaintiffs in the Circuit Court of Cook County Illinois, Case No. 08 CH 45654.

94.     Several years later, the Plaintiffs discovered a transfer of the loan in June 2014 when Wells Fargo filed an Assignment of Mortgage (Assignment) purportedly assigning Loan to from Ada Services to Sand Canyon. See Exhibit 'D' as attached herein.

95.     The Assignment was executed by Melissa Hively (Hively) as Vice President of Ada Services and notarized by Krystal Hall on February 2, 2012. Id.

96.     Pursuant to the Assignment, Sand Canyon was formerly known as Option One. Id.

97.     Pursuant to the Assignment, Ada was formerly known as H&R Block. Id.

98.     The Assignment was prepared by Terrill Nielson of Security Connections Inc. (SCI).

99.     The Property has been foreclosed upon, on May 18, 2016. Therefore the Plaintiffs no longer have an interest in the Property.


_**Facts Related to the Duties of the Master Servicer of the Trust**_

100.    Option One is the Master Servicer of the Loan and the Trust.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

101.    Option One is an indirect wholly owned mortgage banking subsidiary of Block.

102.    During the years of 1993 – 2008 Option One was in the business of originating, sponsoring, selling, and servicing subprime mortgage loans.

103.    During this time, Option One established securitized mortgage trusts for selling RMBS to investors. Option One sponsored each trust and originated and serviced the mortgage loans contained in each trust, including the Trust.

104.    In 2008 Option One changed its name to Sand Canyon Corporation and sold its servicing business to AHMSI.

105.    As with most securitized mortgage trusts, in which the Trust herein is no different, the PSA provides the last step in the mortgage conveyance process is the Depositor's, here Option Acceptance, conveyance or sale of the mortgage loans to the Trust for the benefit of the Trust Certificate holders.

106.    Here, Option Acceptance as the Depositor, Option One as the Originator and Servicer and the Sub-Servicers, had a duty to ensure that its mortgage servicing practices, which include collection procedures of mortgage loan payments, were in conformance with those of prudent mortgage lending institutions which service similar mortgage loans.

107.    Option One, as the Master Servicer, also had a duty to monitor the Sub-Servicers and to use reasonable and good faith efforts to cause the Sub-Servicers to perform their duties and obligations dully and punctually.

108.    Option One was also responsible for administration of the Trust, which includes but is not limited to, pool performance calculations, the preparation and distribution of month distribution reports, preparation and filing of REMIC tax returns on behalf of the Trust REMICs or other legal entities formed pursuant to the PSA, preparation of Form 10-D

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

reports, Form 8-K reports, and Form 10-K annual reports in which all such reports are to be filed with the SEC on behalf of the Trust.

109.    Therefore, Option One has engaged in the business of securities administration for all publicly offered mortgage backed certificates issued by the Depositor, Option Acceptance.

110.    Sand Canyon and Ada Services, as successors in interest to Option One, have also engaged in the business of securities administration as administrators and servicers of the Trust.

### *Facts Related to Robo-Signing*

111.    At the Closing of the Loan, Option One serviced the Loan. Ex. B at ¶ 3.

112.    At the time of foreclosure Ocwen serviced the Loan.

113.    Defendant Ocwen has been found to engage in robo-signing.

114.    Robo-signing is the common practice of the execution of assignments of mortgages and other mortgage related conveyance documents in an assembly line fashion without investigating the allegations and information made in the documents that the affiant attest to, though affiant attest that the information alleged is in affiant's personal knowledge.

115.    In October 2010, after numerous complaints of robo-signing and the widespread use of robosigned affidavits in foreclosure proceedings throughout foreclosure proceedings in this country, attorney generals of states around the country formed a coalition and partnered with the federal government to investigate the robo-signing phenomena.

116.    According to the Congressional Oversight Panel's November Oversight Report, Affidavits such as the ones involved in the foreclosure irregularities are statements made under oath and thus clearly fall within the scope of the perjury statutes.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                                    Case No.

117.    Due to their findings of unsafe and unsound practices in mortgage servicing and foreclosure proceedings, the above-mentioned parties entered various consent decrees with mortgage lenders and servicers who were found to violate these practices.

118.    Defendant Ocwen was one of the many servicers who were found to violate these practices.

119.    The CFPB found that Ocwen engaged in the following practices:

    a.  prepared, executed, notarized, and presented false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); and

    b.  prepared, executed, notarized, and filed affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits.

120.    Pursuant to these violations, in the year 2012 Ocwen entered a consent decree with the Consumer Financial Protection Bureau (CFPB) which eventually led to a $2.1 billion robo-signing settlement agreement with the CFPB.

121.    SCI has also been found to mass produce assignments and other mortgage documents with total disregard for the accuracy of the information and notarization formalities in which the signing individuals and notaries hold dozens of different job titles as needed to fulfill false documents for foreclosing.

122.    Here, SCI produced the Assignment. Ex. D.

123.    Hively as the Vice President of Ada Services executed the Assignment. Id.

124.    However, at all relevant times, Hively was employed by SCI not Ada Services.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                           Case No.

125.    As an SCI employee, Hively also notarizes documents for foreclosure. See Exhibit 'E' as
        attached herein.

126.    Ocwen as Servicer directed SCI to produce the Assignment for purposes of foreclosure.

127.    The Assignment became known to the Plaintiffs when it was filed with the foreclosure
        court on June 20, 2014 by the foreclosure plaintiff in support its motion for judgment.

128.    SCI acted at the direction of Ocwen as a Sub-Servicer, and Ocwen acted at the direction
        of Option One, the Master Servicer.

129.    In addition to robo-signing, government investigations prompted by robo-signing
        violations, revealed other wide spread servicing abuses and poor practices and
        misconduct by servicers of RMBS, including Ocwen and its affiliates.


### _Facts related to the Plaintiffs RICO Counts_

130.    The Defendants collectively conspired to defraud the Plaintiffs for making money, using
        the Trust which affects interstate commerce.

131.    The enterprise has existed since June 2006, when the Trust was purportedly created.

132.    To do so the Defendants operated an enterprise for the investment and acquisition of
        mortgage loans into trust by creating MBS and RMBS.

133.    In the course of its interstate business, the named Defendants regularly extended or
        offered to extend consumer credit for which a finance charge is imposed to create a
        mortgage pool, known as trusts, taking the real estate as collateral, and operating the
        collateral of the Trust by servicing the loans.

134.    A mortgage pool is an enterprise.

135.    Option One and H&R Block created a scheme to defraud the Plaintiffs which leveraged
        risk wherein the money used to fund the scheme was not the borrowers monthly

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                     Case No.

mortgage payments on the loans in the Trust, but rather were the purchases of various RMBS that really were not backed by anything.

136.    Option One and H&R Block carried out this scheme both in the origination of Loan II, the creation and administration of the Trust, and in the foreclosure of the Property, all with the main purpose of making money for the Defendants, at the detriment of the Plaintiffs and the Trust certificate holders.

137.    The structure of the scheme is set as follows:

    a.    H&R Block and Option One, through Wells Fargo, solicited the Plaintiffs to refinance Loan I, with full knowledge of the Plaintiffs financial circumstances.

    b.    Once the Plaintiffs took the solicitation bite, Wells Fargo at the direction of H&R Block and Option One, directed the Plaintiffs to HRMC to broker the Loan.

    c.    The Plaintiffs submitted their financial information to HRMC.

    d.    HRMC submitted the financial information to underwriting, basically to itself, to process and approve Loan II.

    e.    Option One inflates the value of the Property to justify the making of Loan II.

    f.    Option One and H&R Block paid a broker and administration fee to HRMC for securing and closing Loan II and then wires funds to the title company to close Loan II, knowing that the Plaintiffs do not qualify for Loan II and will eventually default on Loan II, and knowing that Option One and H&R Block failed to comply with the Trust underwriting guidelines.

    g.    On information and belief, Option One and H&R Block secured the funds to close Loan II through prior trust agreements and funds by certificate holders, investors.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

h.  Though HRMC is listed as the lender on the closing documents, it was not the lender. Instead the investors of trusts were the lender.

i.  H&R Block and Option One direct the underwriting and creation of Loan II.

j.  Option One, who plays the role of the Servicer, Master Servicer, Originator, and Seller purportedly sells Loan II to Option Acceptance who then in turn sells Loan II to the Trust. Option One was paid for this service.

k.  Option One then purports that Loan II conforms to the Trust underwriting guidelines and the PSA and then proceeds to service and provide further administration services for Loan II and get paid a fee for those services.

l.  For every payment made by the Plaintiffs, Option One received a fee.

m.  Already anticipating the default of Loan II, Option One secured an insurance policy.

n.  Already anticipating the default of Loan II, H&R Block and Option One authorize and direct the creation of false documents to foreclose.

o.  Already anticipating the default of Loan II, H&R Block and Option One and its successors and assigns, authorized and directed Wells Fargo to commence foreclosure.

p.  Upon information and belief, the Defendants were already paid through the insurance policy Option One secured against Loan II, thereby making a profit from the insurance and from the foreclosure, all to the detriment of the Plaintiffs as well as the certificate holders.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

138.    All the Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the scheme to defraud the Plaintiffs of the Property, which successfully occurred.

139.    For the purpose of executing and attempting to execute this scheme, the Defendants, in violation of 18 U.S.C. 1341, placed or caused to be placed in the post offices and/or other authorized repositories, delivered by commercial interstate carrier, and received matter and things from the postal service or commercial and interstate carriers, including but not limited to refinance solicitations, loan applications and other documents to secure and close on Loan II,  and falsified, fraudulent, and defective documents to create Loan II, create the Trust, and to foreclose on the Property.

140.    The enterprise even continues in this pattern of racketeering activity for even while the Defendants stripped the Property away from the Plaintiffs, H&R Block was still soliciting the Plaintiffs, through the mail, to refinance again. See Exhibit 'F' as attached herein.

141.    These practices could not have occurred without the use of the U.S. Mail and various wires including telephones and the internet.

142.    In the trust scheme, none of the Defendants were the borrower, broker, lender, investment banker or investor. Therefore, none of the Defendants had any liability as it relates to Loan II or any of the loans in the Trust.

143.    The origination closing documents reflect the incorrect creditor and fail to disclose the true creditor and the true fees and profits of all parties identified with the transaction. Therefore, the closing documents — note, mortgage and settlement statements are fatally defective and are fraudulently created to make money by deceiving the borrowers and investors of the Trust.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

144.    The activities described in the preceding paragraph were affairs conducted collectively by

the Defendants for making money and securing assets.

145.    Here it makes perfect sense for the Defendants to be a part of the enterprise because all

they did was profit and suffered no losses.

146.    This cause of action did not accrue until the Assignment was filed in June 2014, causing

the Plaintiffs to question the role of Sand Canyon and Ada Services.

<u>CLAIMS</u>

**COUNT I**
***RICO Violation – 18 U.S.C. 1962(c)***
***Against All Defendants***

1.    The Plaintiffs re-state and incorporate the following sections herein: Introduction,

Jurisdiction, Parties, and Factual Allegations.

2.    Racketeering activity includes any act relating to mail fraud and wire fraud. 18 U.S.C.

1341 and 1343 respectively.

3.    Defendants have engaged in a pattern of racketeering activity using wire and mail by: 1)

soliciting Plaintiffs to refinance Loan I; 2) creation and origination of Loan II; 3)

servicing of Loan II; and 4) foreclosing on the Property; in violation of 18 U.S.C.

1962(c).

4.    This pattern of racketeering began with the Loans and when government agencies

provided evidence and cited the parties for their unfair and deceptive acts in the

origination and servicing of mortgage loans, as well as their foreclosure practices.

5.    At the earliest, the Plaintiffs' were not alerted of the Defendants racketeering until the

assignment was filed with the foreclosure court. Factual Allegations at ¶ 146.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                Case No.

6.      This pattern of racketeering caused the Plaintiffs to lose not only their home, the Property, but also all investments they had made into the Property.

7.      In violation of 1341 and 1343 the Defendants placed or caused to be placed in post offices and/or in other authorized repositories matters and things to be sent or delivered by the postal servicer and commercial interstate carriers and received matter and things from the postal servicer and other interstate carriers, misleading, deceptive, and defective documents.

8.      The practices described herein could not have occurred with the use of the postal service and other interstate carriers, as wells as with the use of wires, including telephone wires, facsimiles, and the use the internet.

9.      Option One, H&R Block, AHMSI, Ocwen, Ada, and Sand Canyon are persons. 18 U.S.C. 1961(3).

10.     The Servicers are responsible for operating and managing the business affairs of the enterprise.

11.     The Servicers authorized Wells Fargo to foreclose upon the Plaintiffs and the Property.

12.     Option One as the Master Servicer also directed all Servicers to impose and collect improper fees and assist in filing false mortgage papers to effectuate foreclosure.

13.     Option One also authorized Wells Fargo and HRMC to collect the Plaintiffs documents to submit to H&R Block and Option One to underwrite and fund the Loan.

14.     These activities describe the way the Defendants collectively conducted affairs of the enterprise.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

15.      To foreclose upon the Property the parties employed a system that asserted misleading
         claims, mainly the improper documentation Wells Fargo relied upon to effectuate
         foreclosure.

16.      The Defendants constitute an enterprise engaged in and whose activities affect interstate
         commerce.

17.      The Defendants are enterprises within the RICO Act because they are either an
         individual, partnership, corporation, association, or other legal entity as set forth in the
         Act. 1961(3).

18.      The enterprise, at the very least, has existed since the creation of the Trust, June 2006.

19.      Option One, with the assistance of the Defendants, created a scheme to defraud the
         Plaintiffs by leveraging risk wherein the money used to fund the scheme was not
         Plaintiffs or any borrower's payments, but instead the scheme was funded by purchases
         of alleged RMBS.

20.      Option One carried out this scheme not only in the origination the Loan, but in the
         administration of the Trust and the foreclosure of the Property.

21.      The scheme operated as follows: the Plaintiffs were solicited by Wells Fargo regarding
         refinance mortgage loan on behalf of Block, when Block already held Plaintiffs'
         mortgage loan at that time. Wells Fargo gathered all required financial documentation to
         submit to Block for approval of the Loan. Block approves the Loan and pays a fee to
         Wells Fargo for closing on the Loan in the name of Block. However, considering
         Plaintiffs' financial position, Plaintiffs did not qualify for the Loan and Block already
         knew this not only because of the financial documentation Plaintiffs' submitted for the
         Loan, but also because Block was already the lender on Plaintiffs' then existing mortgage

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

loan at that time. Though Plaintiffs did not technically qualify for the Loan, Block approved the Loan by hiking the value of the Property to justify the Loan.

22.     The sponsor and originator purportedly sold the Loan to Option Mortgage as the Depositor, who in turn sold the Loan to Trust. Option One and the Servicers get paid a fee for the service it provided. Option One, as the master servicer proceeds as if the Loan complies with the PSA. For every payment that the Plaintiffs make on the Loan, the Servicers receive a fee, both the servicer who directly administers the Loan as well as the Master Servicer. However, Option One already anticipating the Plaintiffs would default on the Loan, takes out an insurance policy on the Loan in the event of default on the Loan.

23.     Wells Fargo commences foreclosure suit and successfully forecloses upon the Property. However, the Defendants, pursuant to their RICO scheme, were already paid from the default insurance proceeds.

24.     The Plaintiffs have been injured by the loss of their home, the Property, and all investments into their home including but not limited to mortgage payments of interest and principal, fees, insurance, taxes, etc.; as well as attorneys' fees and costs.

25.     The Plaintiffs were the intended target of the Defendants conduct.

**WHEREFORE**, the Haddad Plaintiffs respectfully pray this Honorable Court award them actual damages; statutory damages; treble damages; punitive damages; and reasonable attorney fees and cost of suit.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

## COUNT II
### *RICO Violation – 18 U.S.C. 1962(d)*
### *Against All Defendants*

1.      The Plaintiffs re-state and incorporate the following sections herein: Introduction, Jurisdiction, Parties, and Factual Allegations.

2.      Defendants conspired to originate Loan II, knowing it was bound to default and lead to foreclosure and created false documents to execute the Loan and foreclose, in violation of 18 U.S.C. 1962(d).

3.      The Defendants conspired with Servicers, Sub-Servicers, and CSI to use the enterprise to enrich themselves and foreclose upon the Property.

4.      The Defendants intentionally conspired and agreed to conduct and participate in the affairs of the enterprise through the racketeering activity in violation of 18 U.S.C. 1962(c) and (d).

5.      The Defendants are therefore liable to the Plaintiff for their RICO violations.

**WHEREFORE**, the Haddad Plaintiffs respectfully pray this Honorable Court award them actual damages, statutory damages, treble damages, punitive damages and reasonable attorney fees and cost of suit.

## COUNT III
### *Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)*
### *Against All Defendants*

1.      The Plaintiffs re-state and incorporate the following sections herein: Introduction, Jurisdiction, Parties, and Factual Allegations.

2.      The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibit fraudulent, deception, misrepresentation, concealment, and suppression of any material fact during the conduct of trade or commerce. 810 ILCS 505/1-505/12.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

3.      The ICFA is the Illinois Unfair and Deceptive Acts and Practices (UDAP) statute.

4.      Unfair or deceptive acts and practices, including but not limited to, deception, fraud, false

        pretense, false promise, and misrepresentation, of any material fact with the intent that

        others rely upon the deception of such material fact is unlawful regardless of whether any

        person has in fact been misled, deceived, or damaged thereby. Id.

5.      Banking and credit activities are included in the course of conduct of trade or commerce

        for purposes of the Illinois UDAP statute.

6.      The Defendants violated 815 ILCS 505/2 by engaging in unfair acts and practices to

        collect a superseded debt.

7.      This activity, promulgated by the enterprise, lead to the foreclosure of the Property.

8.      This caused substantial damage to the Plaintiffs through the loss of their home, loss of

        available credit, significant decreased health of Ronald, and severe emotional distress.

9.      The deceptive practices occurred during the course of trade or commerce, securing a

        refinance mortgage on the Property and the administration and servicing of Loan II.

10.     Defendants are liable to the Plaintiffs for actual damages, punitive damages, attorney

        fees, and litigation costs. 815 ILCS 505/10a.

**WHEREFORE**, the Haddad Plaintiffs respectfully pray this Honorable Court award them actual

damages, punitive damages, and reasonable attorney fees and cost of suit.


## COUNT IV
### *Civil Conspiracy*
*Against All Defendants*

1.      The Plaintiffs re-state and incorporate the following sections herein: Jurisdiction, Parties,

        and Factual Allegations.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

2.      The Defendants conspired to arrange and produce Loan II, knowing Loan II did not

        comply with the underwriting guidelines of the Trust, and knowing that Loan II would

        default.

3.      Defendants then continued the conspiracy by foreclosing upon the Property.

4.      The conspiracy occurred for profit through greed in which the Plaintiffs have been

        significantly damaged.

**WHEREFORE**, the Plaintiffs respectfully pray that this Honorable Court grant them actual

damages, punitive damages, and reasonable attorney fees and cost of suit.

### COUNT V
*Intentional Infliction of Emotional Distress*
*Against All Defendants*

1.      The Plaintiffs re-state and incorporate the following sections herein: Jurisdiction, Parties,

        and Factual Allegations.

2.      The Defendants conduct in developing and acting out the enterprise purely for greed at

        the immense detriment of borrowers and investors, without any disregard to not only the

        destruction the effect of the enterprise had on each individual borrower, but on borrowers

        collectively, investors collectively, and the destruction of communities and the U.S.

        economy, was reckless, extreme, and outrageous.

3.      Defendants conduct was willful and knowing.

4.      As a result of the Defendants conduct, the Plaintiffs, have endured severe emotional

        distress resulting in immense stress, significant deterioration of health, anxiety,

        depression, and the loss of their home which has been detrimental.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

5.      This stress caused continual arguments and problems in the Plaintiffs marriage in which
        the Plaintiffs have since separated living separate and apart, now creating two separate
        households with separate expenses to operate the separate households.

6.      Even prior to the Plaintiffs' living separate and apart, the lived apart while in the Property
        due to continual stress and arguments which prevented the Plaintiffs from being cordial
        and civil to one another under the same roof, eventually leading to Ronald leaving the
        Property in an attempt to at least improve his health and stress levels.

7.      This stress and anxiety not only affected the Plaintiffs relationships with one another, but
        also affected their relationships with their children, their co-workers and colleagues, and
        neighbors and friends.

8.      The separation of their parents and the loss of the Property have been detrimental to the
        Plaintiffs children, causing depression and frustration in their children who have
        struggled through the psychological loss of the home they were raised and reared in and
        embarrassment before neighbors and friends.

9.      The Plaintiffs children have also incurred financial, physical, and emotional stress in
        trying to assist the Plaintiffs in their struggles with the Property and housing relocation.

10.     This stress caused Plaintiff Ronald to suffer two strokes in which he is still recovering
        and will likely not return to 100% full functioning capacity.

11.     This stress also caused the deterioration in health of Plaintiff Priscilla which includes
        depression, anxiety and fibromyalgia.

12.     These ailments have further caused a significant loss of income for the Plaintiffs.

13.     Though the Plaintiffs fortunately have medical insurance, Plaintiffs still have direct out-
        of-pocket medical expenses.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                                    Case No.

14.     The Plaintiffs out-of-pocket medical expenses include co-payments, deductibles, and medication.

15.     Ronald's out-of-pocket medical expenses have exceeded $50,000 to date while Priscilla's out-of-pocket medical expenses have exceeded $8k.

16.     In addition, the Plaintiffs' medical expenses are continual and the Plaintiffs physical conditions are unlikely to medically change.

17.     Ronald's out of pocket medical expenses have averaged $6500 annually, however that average is expected to increase considering the increase in medical fees and costs due to inflation and other factors.

18.     Priscilla's out of pocket medical expenses averaged $2800 annually, however that average is expected to increase considering the increase in medical fees and costs due to inflation and other factors.

19.     The physical harm done to the Plaintiffs were caused by their stress and anxiety related to Loan II and foreclosure, as proximately caused by the Defendants, also prevented the Plaintiffs from income earnings due to their inability to function as required to perform daily work requirements.

20.     As a direct and proximate result of the Defendants willful and wanton conduct, the Plaintiffs have suffered actual medical expenses, anticipated future medical expenses, emotional distress, and income and monetary losses in excess of $4,000,000.

**WHEREFORE**, the Haddad Plaintiffs respectfully pray this Honorable Court award them actual damages, punitive damages, and attorneys' fees and cost of suit.

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

## COUNT VI
### *Loss of Consortium*
*Against All Defendants*

1.      The Plaintiffs re-state and incorporate the following sections herein: Jurisdiction, Parties, and Factual Allegations.

2.      Plaintiffs have suffered a loss of consortium due to the Defendants actions and conspiracy.

3.      At all relevant times herein, the Plaintiffs were married and continue to be legally married.

4.      As a result of the wrongful and negligent acts of defendants as detailed herein, the Plaintiffs were caused to suffer and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

5.      The aforesaid injuries and damages were caused solely and proximately by the negligence of the defendants.

6.      The stress of Loan II not only caused financial stress, physical stress, and emotional stress on the Plaintiffs, but it also caused a stress on the Plaintiffs marriage which has led to the breakdown of the marriage.

7.      Plaintiffs have loss the emotional support, financial support, and companionship of each other, including the loss of sexual relations.

8.      Though the Plaintiffs are still legally married, and have been married since 1974, the Plaintiffs are apart and are no longer a couple.

9.      Since the marriage the Plaintiffs have cohabitated, but the breakdown of the marriage caused the Plaintiffs to live separate and apart for at least the last two years of their

Ronald Haddad v. American Home Mortgage Servicing, Inc., et al.                    Case No.

interest in the Property; in which now the Plaintiffs have limited communication with each other and communicate vicariously through their children.

10.     Plaintiffs seek damages for loss of services, loss of support and loss of quality in the marriage.

11.     Plaintiffs claim for loss of services includes chores, household work and maintenance.

12.     Plaintiffs claim for loss of support include both emotional and financial support, including loss of love, affection, companionship, sexual relations, and loss of reliance upon each other for advice and support.

13.     The Plaintiffs marriage was not previously strained until a breakdown leading to the loss of the Property and the battle in trying to retain the Property.

14.     The Plaintiffs jointly as husband and wife, demand $3.5 million for loss of consortium.

**WHEREFORE**, the Plaintiffs respectfully pray that this Honorable Court grant them $3.5 million and reasonable attorney fees and cost of suit.

Respectfully submitted,

_____/s/Sabrina Herrell_____

Sabrina Herrell of Logik Legal LLC

LOGIK Legal LLC
Attorneys for Plaintiffs
Phone: 773.568.5620
Fax:     888.785.6445
Email:  legalservices@logiklegal.org
Atty No.:  6277650