| | | |
|---|---|---|
| Priscilla A. Haddad, | ) | |
| Ronald A. Haddad, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| American Home Mortgage Servicing, Inc., | ) | |
| Ocwen Loan Servicing, LLC, | ) | No. 18 C 00731 |
| Ocwen Financial Corp., | ) | |
| Homeward Residential Holdings, Inc., | ) | Judge Edmond E. Chang |
| Option One Mortgage Acceptance Corp., | ) | |
| Option One Mortgage Corp., | ) | |
| H&R Block Mortgage Corp., | ) | |
| H&R Block, Inc., | ) | |
| Ada Services Corp., and | ) | |
| Sand Canyon Corp., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## Introduction

Plaintiffs Priscilla and Ronald Haddad lost their home to foreclosure in 2016 and in the process suffered significant stress in their financial lives and their marriage. In January 2018, they filed this case, seeking to hold the Defendants liable for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c)-(d), and state law claims under the Illinois Consumer Fraud and Deceptive Businesses Practices Act, 815 ILCS 505/1, *et seq.*, civil

conspiracy, intentional infliction of emotional distress, and loss of consortium.[1] *See* R. 1, Compl.[2]

In response, the Defendants filed motions to dismiss. American Home Mortgage Servicing, Inc., Ocwen Loan Servicing, LLC, the Ocwen Financial Corporation, and Homeward Residential Holdings, Inc. (call them the "Ocwen Defendants") filed a joint motion to dismiss for lack of jurisdiction and failure to state a claim. R. 55, Ocwen Mot. Dismiss; *see also* R. 56, Ocwen Br.[3] The other Defendants, Option One Mortgage Acceptance Corporation, Option One Mortgage Corporation, H&R Block Mortgage Corporation, Ada Services Corporation, and Sand Canyon Corporation (call them the "Option One Defendants") did the same, relying on the Ocwen Defendants' arguments. R. 60, Option One Mot. Dismiss.

The Defendants all argue that the Haddads' claims are barred under the *Rooker-Feldman* doctrine and claim preclusion, as well as the relevant statutes of limitations, and additionally that they fail to state claims under Federal Rules of Civil Procedure 8(a) and 9(b). *See* Ocwen Mot. Dismiss; Ocwen Br.; Option One Mot. Dismiss. In April 2018, the Haddads voluntarily dismissed their claim brought under

---

[1]The Plaintiffs assert that the Court has subject matter jurisdiction over their federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over their state-court claims under 28 U.S.C. § 1337. The Defendants' motions have challenged the Court's jurisdiction, and this Opinion will address those arguments.

The Haddads originally also included claims against H&R Block, Inc. in their complaint. They voluntarily dismissed claims against H&R Block, Inc. in August 2017, R. 80, in response to H&R Block, Inc.'s motion to dismiss, R. 70.

[2]Citations to the docket are noted by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[3]The Ocwen Defendants initially filed two separate motions to dismiss, R. 43 and R. 45, but the Court dismissed those motions without prejudice and instructed them to file one motion instead, *see* R. 54.

the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* R. 25, Mot. Voluntarily Dismiss; R. 28, Order (dismissing Count 3).

For the reasons explained below, the Haddads' federal claims are barred because, as the complaint itself makes clear, those claims fall outside the RICO statute of limitations, and alternatively because they fail to state claims under Rules 8(a) and 9(b). Because the basis for the Court's supplemental jurisdiction over the state law claims was its jurisdiction over the federal questions in Counts 1 and 2, and the Haddads have not asserted diversity, the Court relinquishes supplemental jurisdiction over the state law claims, namely, civil conspiracy, intentional infliction of emotional distress, and loss of consortium. Those claims are dismissed without prejudice to refiling in state court.

## I. Background

For the purpose of deciding this motion, the Court accepts the allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). As a preliminary matter, ordinarily, a court may not consider matters outside the pleadings when deciding a motion to dismiss. *Doss v. Clearwater Title Co.,* 551 F.3d 634, 639-40 (7th Cir. 2008). A court may, however, take judicial notice of matters of the public record without converting a motion to dismiss into a motion for summary judgment. *Ennenga v. Starns,* 677 F.3d 766, 773-74 (7th Cir. 2012). This "narrow exception" only permits judicial notice of facts that are "not subject to reasonable dispute." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080-81 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)). A fact is not subject to reasonable dispute when it "(1)

is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice thus "allow[s] courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Gen. Elec. Capital,* 128 F.3d at 1081. A court may also consider documents attached to a motion to dismiss without transforming it into a motion for summary judgment if the documents are "referred to in the plaintiff's complaint and are central to his claim." *McCready v. eBay, Inc.,* 453 F.3d 882, 891 (7th Cir. 2006) (cleaned up).[4] Based on these principles, the Court will consider the underlying state-court foreclosure records, R. 56-17, Ocwen Exh. Q, which are in the public record, as well as the assignment of the mortgage servicing rights to Sand Canyon Corporation, R. 1-4, Compl. Exh. D, and the Pooling and Servicing Agreement for the trust in which the Haddads' mortgage had been placed, R. 1-1, Compl. Exh. A, which are both attached to and referred to in the complaint.

In September 1987, Ronald and Patricia Haddad bought their home in River Forest, Illinois for around $87,000. Compl. ¶ 68 at 14, ¶ 73 at 15. In February 2005, they took out a mortgage loan on the house through H&R Block. *Id*. ¶ 69 at 14. At the time, they had an annual income of $17,997, and they allege that their monthly mortgage payments on the loan were $1,400. *Id*. ¶¶ 76-77 at 15.[5] About a year after

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[5]The Defendants argue that the Haddads' payments at this time were higher than they have alleged, Ocwen Br. at 2, 19-20, and the application for a refinance that Ocwen submitted as an exhibit to its motion states that the monthly payments of principal and

the 2005 mortgage, the Haddads' income had fallen—Ronald's business placing classified news advertisements was collapsing—and they were struggling to make mortgage payments. *Id*. ¶ 71 at 14, ¶ 74 at 15. The mortgage was serviced by Option One. *Id*. ¶ 79 at 15. Around that same time, Wells Fargo began to call them to let them know they could refinance their mortgage. *Id*. ¶ 70 at 14. One of Wells Fargo's representatives, a person named Josh, told the Haddads that their home was worth $750,000. *Id*. ¶ 73 at 15. The Haddads seem to suggest that Wells Fargo knew the Haddads were struggling to make their mortgage payments because Wells Fargo was communicating about them with servicer Option One in some way. *Id*. ¶¶ 79-80 at 15.

In any case, the Haddads refinanced their 2005 loan—again, with H&R Block—on March 4, 2006. Compl. ¶ 81 at 15. The principal amount of the new adjustable-rate loan was $470,000, and the initial monthly payments of principal and interest were $2,970.72. *Id*. ¶¶ 81, 83 at 15-16. On May 1, 2008, the interest rate adjusted, increasing the monthly principal and interest payment to $3,667.16. *Id*. ¶¶ 83-84 at 16.

The Haddads' loan was serviced at different points by AHMSI, Option Mortgage, Ocwen, Sand Canyon, and Ada Services. Compl. ¶ 89 at 16. In 2008, servicing rights appear to have been transferred from "Ada Services Corporation FKA H&R Block Mortgage Corporation" to "Sand Canyon Corporation FKA Option One

---

interest were $3,407. R. 56-3, Ocwen Exh. C, Refinance App. at 3. But the application is not attached to or referred to in the complaint, and Ocwen does not argue that it is available in the public record, so the Court does not consider it for the purposes of evaluating the Defendants' motions to dismiss.

Mortgage Corporation." Compl., Exh. D, Sand Canyon Assignment. The Haddads allege that they first learned of this transfer when it was filed in their state-court case in 2014 (though it appears to have been recorded in 2012). Compl. ¶ 94 at 17.

The Haddads eventually fell behind on their payments again, and Wells Fargo, as Trustee for an Option One trust, began a state-court foreclosure case against them in December 2008. Compl. ¶ 99 at 17; *see* Ocwen Exh. Q, Foreclosure Docket at 1-8. On May 18, 2016, the state court entered an order confirming the sale and distribution of the Haddads' home. Compl. ¶ 99 at 17; Ocwen Exh. Q, Foreclosure Docket at 102-104.

## II. Legal Standard

The Ocwen and Option One Defendants bring their motions under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion tests whether the Court has subject-matter jurisdiction, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Long v. ShoreBank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999), while a Rule 12(b)(6) motion "test[s] the sufficiency of the complaint," *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (cleaned up); *Hallinan*, 570 F.3d at 820..

In order to survive a Rule 12(b)(1) motion, the plaintiff must establish that the district court has jurisdiction over an action. *United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2011), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). "If subject matter jurisdiction is not evident on the face of the complaint, [then] the ... Rule 12(b)(1) [motion is]

analyzed [like] any other motion to dismiss, by assuming for the purposes of the motion that the allegations in the complaint are true." *United Phosphorus*, 322 F.3d at 946. But "if the complaint is formally sufficient but the contention is there that there is *in fact* no subject matter jurisdiction, [then] the movant may use affidavits and other material to support the motion." *Id.* (emphasis in original).

The other ground that the defense advances is Rule 12(b)(6). "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan*, 570 F.3d at 820. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Ordinarily, claims must only meet the Rule 8(a)(2) standard. But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). And Rule 9(b)'s heightened pleading standard applies to RICO claims that allege fraud. *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001); *see also Roppo v. Travelers Comm. Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th

Cir. 1998). Thus, Rule 9(b) requires, generally speaking, that the Haddads' complaint state "the identity of the person making the misrepresentation, the time, place[,] and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Slaney*, 244 F.3d at 599. Put differently, their complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up).

## III. Analysis

### A. *Rooker-Feldman*

The defense brings a jurisdictional challenge based on the *Rooker-Feldman* doctrine. Ocwen Br. at 8-10; *see Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). This doctrine rests on the premise that the Supreme Court is the only federal court with appellate authority over state-court decisions. *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 532 (7th Cir. 2004). It prevents lower federal courts—such as this District Court—from exercising jurisdiction over cases challenging state-court judgments entered before the losing party files a federal suit. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005).

Although the core of *Rooker-Feldman* is that it bars a party from directly contesting a state-court judgment's validity in a lower federal court, the doctrine also applies when a party brings a federal case that is "closely enough related" to a state-court judgment, even if the losing party is not directly asking the lower federal court

8

to review the state judgment. *Mains v. Citibank*, 852 F.3d 669, 675 (7th Cir. 2017). For example, if the federal plaintiff really is seeking relief for an injury that is *caused* by the state-court judgment, then in effect the plaintiff really is seeking— impermissibly—review of the judgment. *Id.* So the doctrine applies if there is "no way for the injury complained of by a plaintiff to be separated from a state court judgment." *Id.* (quoting *Sykes v. Cook Cty. Cir. Ct. Prob. Div.,* 837 F.3d 736, 742 (7th Cir. 2016)). In contrast, if a suit seeks damages for independently unlawful conduct— separate and apart from the state-court judgment—it should not be barred. *See Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769, 773 (7th Cir. 2014).

There are some allegations in the complaint that suggest the Haddads might have sought to invalidate the state court's judgment of foreclosure, or otherwise sought relief "inextricably intertwined" with the state court judgment. *Exxon*, 544 U.S. at 286 n.1 (quoting *Feldman*, 460 U.S. at 486). Many of the allegations in the complaint present accusations of in the origination of the mortgage, fraud in the foreclosure process, or the Haddad's loss of the property more generally. *See* Compl. ¶ 138 at 24 (alleging that the "defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the scheme to defraud the Plaintiffs of the property."); *id.* ¶ 143 at 24 ("[T]he closing documents—note, mortgage and settlement statements—are fatally defective and are fraudulently created to make money by deceiving the borrowers and investors of the Trust."); *id.* ¶ 6 at 26 ("This pattern of racketeering activity caused the Plaintiffs to lose not only their home, the Property, but also all the investments

they had made into the Property."); *id*. ¶ 20 at 27 ("Option One carried out this scheme not only in the origination of the Loan, but in the administration of the Trust and the foreclosure of the Property."); *id*. ¶ 21 at 27-28 ("Plaintiffs did not qualify for the Loan and Block already knew this … Though Plaintiffs did not technically qualify for the Loan, Block approved the Loan by hiking the value of the Property to justify the Loan.").

But the Haddads' briefing entirely abandons any attempt to challenge the state foreclosure judgment or the validity of their mortgage loan: "The basis of the foreclosure action was that Plaintiffs failed to make required payments under the terms of the note and thereby defaulted on their mortgage loan. The Property was foreclosed upon due to the Plaintiffs['] default under the provisions of the loan documents. The Plaintiffs do not and cannot challenge []or dispute the foreclosure." R. 77, Pls. Resp. at 8. So to the extent that *Rooker-Feldman* could apply to some of the allegations and claims in the complaint, those allegations are no longer at issue.

Allegations in the complaint that are not for injuries arising from the state court judgment can survive *Rooker-Feldman*. It is worth pausing to note that not all allegations related to a mortgage loan are necessarily inextricably linked with a state-court foreclosure judgment. In *Mains v. Citibank,* for example, the Seventh Circuit held that the borrower's claim, which sought an accounting on the loan to determine if the lender charged him improper late fees, did not run afoul of *Rooker-Feldman*, because the late fees were imposed during the payment-plan period, well before the foreclosure judgment was entered. *Mains*, 852 F.3d at 676. The remaining claims in

this complaint are similar: "The breakdown of the Plaintiffs['] 40-year marriage, their declining health from [the] stress of the conspiracy and the loan were unconnected to the foreclosure and occurred before the foreclosure terminated their interest in the property." Pls. Resp. at 9. To be sure, the question of whether the Haddads have sufficiently pled those allegations and injuries is a different one, addressed below.

Because the Haddads' briefing substantially narrows the claims that are left, *Rooker-Feldman* does not bar the suit.[6]

---

[6]The Defendants also argue that the suit is barred by claim preclusion. Ocwen Br. at 10-13. Because a state-court judgment is at issue here, the Court must analyze claim preclusion under Illinois law. Illinois courts have three requirements for the application of claim preclusion: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998). The Haddads pointed out in response that the state court foreclosure case involved slightly different parties than this case. Pls. Resp. at 11. The state court foreclosure case was brought by Wells Fargo Bank, N.A. as trustee for Option One Mortgage Loan Trust. *See* Ocwen Exh. Q, Foreclosure Docket at 1. It is conceivable that Option One is in privity with Wells Fargo, since Wells Fargo brought the state court suit as trustee for an Option One trust. But it is almost impossible to determine based on the complaint alone whether all the Defendants were somehow in privity with Wells Fargo and the Option One Mortgage Loan Trust. *See* Compl. ¶ 2 at 3-¶ 15 at 4 (alleging some of the Defendants' relationships to each other, though not necessarily as they relate to this particular case); *see also Oshana v. FCL Builders, Inc.*, 994 N.E.2d 77, 83 (Ill. App. Ct. 2013) ("Privity [] exists when parties adequately represent the same legal interests. There is no generally prevailing definition of 'privity' that the court can apply in all cases; rather, determining privity requires careful consideration of the circumstances of each case.") (cleaned up); *Mount Mansfield Ins. Grp., Inc. v. American Int'l Grp., Inc.*, 865 N.E.2d 524, 529-30 (Ill. App. Ct. 2007) (reasoning that the plaintiff's sole shareholder may not have been in privity with it for claim preclusion purposes except under certain conditions). The Defendants did not reply to this point. *See* R. 78, Ocwen Reply at 6-8. Especially given that it is the Defendants' burden to prove claim preclusion applies, *Indian Harbor Ins. Co. v. MMT Demolition, Inc.*, 13 N.E.3d 108, 115 (Ill. App. Ct. 2014) ("The burden of showing that *res judicata* applies is on the party invoking the doctrine."), the Court has no basis to dismiss the Haddads' claims for claim preclusion.

Finally, the Defendants argue that the Haddads do not have standing to challenge the Defendants' compliance with the Pooling and Servicing Agreement (PSAs) and underwriting guidelines. Ocwen Br. at 13. The Seventh Circuit has previously held that for a PSA governed by New York state law, like the one at issue here, "a mortgagor whose loan is owned by a trust is not an intended beneficiary of a trust, and does not have standing to challenge the trustee's possession or status as assignee of the note and mortgage." *In re Jepson*, 816 F.3d

## B. Statute of Limitations

The Defendants also argue that the Haddads' claims are barred by their respective statutes of limitations. Ocwen Br. at 24-25. Usually, because a statute of limitations defense is an affirmative defense, the proper way to analyze a dismissal motion on that ground before summary judgment (if at all) is as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)). It is true that a plaintiff is not required to plead facts in the complaint to anticipate and defeat a statute of limitations defense. But when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, dismissal is appropriate. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010) ("[I]f it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading.") (citations omitted). Here, the Haddads have not argued that they need discovery on the Defendants' statute of limitations defenses or that these defenses cannot be decided at this stage for any other reason. So the Court will consider the Defendants' arguments on this point.

---

942, 946 (7th Cir. 2016) (cleaned up); *see also* Compl. Exh. A, Excerpts from Trust PSA at 61 ("This Agreement shall be construed in accordance with the laws of the State of New York."). But, as with challenges to the foreclosure judgment, the Haddads have disclaimed any challenge to the securitization of their loan. Pls. Resp. at 7-8. So the Court need not reach this issue.

The statute of limitations for civil RICO claims filed in federal court is four years, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 149-156 (1987) (holding that a uniform statute of limitations of four years applies to all civil RICO cases), and it begins to run when the plaintiff knows or should know of his injury, *Rotella v. Wood*, 528 U.S. 549, 552-53 (2000). The statute of limitations does not only begin to run, as the Haddads argue, "when a plaintiff is aware of both the injury, the source of the injury, and that the injury is part of a pattern." Pls. Resp. at 15. The case the Haddads cite for that proposition, *Bivens Gardens Office Bldg., Inc. v. Barnett Bank, Inc.*, 906 F.2d 1546, 1554-55 (11th Cir. 1990), embraced the "injury and pattern discovery rule," which was explicitly rejected by the Supreme Court in *Rotella*, 528 U.S. at 553-54.

The question here is when the Haddads should have known of their injury. The Haddads' proposed June 2014 date is based on the date they discovered the 2008 assignment of their mortgage-servicing rights from Ada Services to Sand Canyon (filed by Wells Fargo in the underlying state-court case). *See* Compl. ¶ 94 at 17; Compl. Exh. D, Sand Canyon Assignment at 3. But that date does not work, not just because it seems to rely on the injury and pattern-discovery rule the Supreme Court has rejected. Remember that the Haddads have explicitly stated that the injury they allege is *not* the foreclosure of their home but the distress they experienced before the foreclosure took place. Pls. Resp. at 7 ("The basis of the foreclosure action was that Plaintiffs failed to make required payments under the terms of the note and thereby defaulted on their mortgage loan. The Property was foreclosed upon due to the

Plaintiffs['] default under the provisions of the loan documents. The Plaintiffs do not and cannot challenge []or dispute the foreclosure."); *id*. at 9 (arguing that the Haddads' injuries included "[t]he breakdown of [their] 40-year marriage" and "their declining health from [the] stress of the conspiracy and the loan," and that those injuries occurred before the foreclosure). So the date on which they lost their home, or the date the foreclosure case was filed, are not the dates on which the first knew or should have known of their injuries. Instead, they knew of the injuries *before* the foreclosure case was filed.

There are a few possible dates on which the Haddads might have known—or on which they should have known—of the injuries alleged in the complaint. All of those dates are more than four years before they filed the complaint on January 31, 2018. The most plausible date is likely when they first fell behind on their loan payments. Although the exact date when they fell into default is not alleged in the complaint,[7] the Complaint does allege that the foreclosure case was filed on December 8, 2008, Compl. ¶ 93 at 17, so taking the facts in the complaint as true, the Haddads defaulted on their mortgage loan in 2008 at the latest. Alternatively, they might have discovered their injury in 2006, when they refinanced under what they alleged were suspicious circumstances. *See id*. ¶ 81 at 15-16. Or maybe on May 1, 2008, when the Haddads allege that the interest rate of their loan adjusted and their payments increased dramatically. *See id*. ¶¶ 83-85 at 16. In any case, *any* possible date on which the Haddads knew or should have known that they could not afford the loan and were

---

[7]In its state court foreclosure complaint, Wells Fargo alleged that the default occurred on August 1, 2008. Ocwen Exh. Q, Foreclosure Docket at 5.

feeling distress about it, was before the foreclosure case began in December 2008—well over four years before this complaint was filed. So the Plaintiffs' RICO claims are barred by the statute of limitations.

## C. Failure to State a Claim

In the alternative, the Defendants argue that the Haddads' complaint fails to state RICO claims in Counts 1 and 2. For the sake of completeness, the Court will address those arguments too. Count 1 claims that the Defendants violated RICO under 18 U.S.C. § 1962(c). Compl. ¶ 1 at 25-¶ 25 at 28. A RICO claim under 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015).

Count 2 is slightly different: it alleges that the Defendants *conspired* to violate RICO under 18 U.S.C. § 1962(d). Compl. ¶¶ 1-5 at 29. Pleading a RICO conspiracy claim requires a plaintiff to "allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (cleaned up). Where a plaintiff has pleaded a RICO violation under 18 U.S.C. § 1962(c), an accompanying RICO conspiracy claim requires that the complaint additionally allege an agreement. *See id.* ("DeGuelle has properly alleged that his termination was proximately caused by

a RICO predicate act of retaliation. We are therefore left to determine whether DeGuelle's complaint properly alleges an agreement.").

### 1. Failure to Allege Fraud under Rule 9(b)

For Count 1 to survive under the standard set out above, the complaint must include allegations of a pattern of racketeering activity—that is, "a series of criminal acts as defined by the statute." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Seventh Circuit has explained that "[a] pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other." *DeGuelle*, 664 F.3d at 199. RICO defines racketeering activity as any of the specific racketeering acts set forth in 18 U.S.C. § 1961(1). The specific racketeering activity in which the Haddads allege the Defendants engaged is "mail fraud and wire fraud" under 18 U.S.C. §§ 1341 and 1343. Compl. ¶ 2 at 25. Section 1341 prohibits, essentially, conducting fraud through the mail system. Section 1343, in turn, prohibits transmitting communications used in a fraudulent scheme "by means of wire, radio, or television communication in interstate or foreign commerce." And "because a RICO plaintiff must allege two predicate acts of fraud, she must satisfy the requirements of Rule 9(b) twice." *Slaney*, 244 F.3d at 599.

The Seventh Circuit has warned that courts should not "take an overly rigid view of the [Rule 9(b)] formulation," and the requirements "may vary on the facts of a given case." *Pirelli*, 631 F.3d at 442. All the same, the complaint must plead the circumstances of fraud "in detail." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also, e.g., United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d

849, 853-54 (7th Cir. 2009) (deeming a complaint sufficient where it alleged five contracts, the defendant's promise that it intended to keep the contracts, the defendant's intent not to keep its promise, and the ways in which the defendant's performance did not meet its promise). The Defendants argue that the Haddads have not met this requirement.

Most of the allegations of fraud in the complaint are vague and fail to specify any of the circumstances that amounted to the alleged fraud. For example, the Haddads allege that the Defendants "created a scheme to defraud the Plaintiffs which leveraged risk wherein the money used to fund the scheme was not the borrowers' monthly mortgage payments on the loans in the Trust, but rather were the purchases of various [residential mortgage-backed securities] that were not really backed by anything." Compl. ¶ 135 at 21-22. They argue that the Defendants thus committed fraud "in the origination of Loan II, the creation and administration of the Trust, and in the foreclosure of the Property." *Id.* ¶ 136 at 22. Those allegations just set forth the general scheme without any of the requisite particularity under Rule 9(b).

The closest the complaint comes to describing a particular instance of fraud is in its allegations that a Wells Fargo employee named Josh "informed the Plaintiffs that the Property was worth $750,000, substantially more than the $87,000 fair market value of the Property when Plaintiff[s] acquired the Property." Compl. ¶ 73 at 15. But the Haddads first acquired the property in 1987. *Id.* ¶ 68 at 14. There is no reason to believe that its purchase price in 1987 is a valid estimate of its value almost 20 years later in 2005 and 2006, when the Haddads were considering

refinancing. On the face of the complaint, there is no particular reason to assess Josh's statement as inaccurate—let alone that he fraudulently knew that it was wrong and that he intended to mislead the Haddads.[8] Relatedly, the Haddads allege that H&R Block "hik[ed] the value of the Property to justify the loan," *id.* ¶ 21 at 27-28, and that "Option One inflate[d] the value of the Property to justify the making of [the] Loan," *id.* ¶ 137 at 22. These allegations provide even less detail than the one above—there is no information provided on how, when, or in what context the Defendants made the alleged misrepresentations—and they similarly fail to satisfy Rule 9(b).

So the Haddads have not pleaded mail or wire fraud sufficiently to meet the standard set out in Rule 9(b) even once. But even if the Court could credit Josh's statement as the first act of racketeering, the Haddads have not alleged a second act that satisfies Rule 9(b). In fact, it is not clear from the complaint what other criminal activity the Haddads allege at all. As described above, the complaint describes the general practice of residential mortgage securitization at some length, Compl. ¶ 1 at 5-¶ 67 at 14, but the Haddads have abandoned any claims based on the securitization of the loans, *see* Pls. Resp. at 7-8. It also alleges facts about the servicing of the mortgage trust and the alleged robo-signing of foreclosure documents. *Id.* ¶ 100 at 17-¶ 129 at 21. But the facts about the trust servicing do not seem to include any

---

[8]And in any case, it is important to note that a faulty home value *estimate* is not necessarily a fraudulent statement of *fact*. *See Patel v. Zillow*, 915 F.3d 446, 448 (7th Cir. 2019) ("Zestimates are opinions, which canonically are not actionable" under the Illinois Deceptive Trade Practices Act) (citing *Sampen v. Dabrowski*, 584 N.E.2d 493, 498 (Ill. App. Ct. 1991) for the proposition that "where a valuation is explicitly labeled an estimate, there is no deception").

allegations of wrong-doing—much less fraud—and the facts about robo-signing do not include allegations that any document in this case was robo-signed. So there are no successful allegations of mail or wire fraud in the complaint—much less a pattern of racketeering activity.

As a result, Count 1 must be dismissed for failing to satisfy Rule 9(b). And Count 2, which requires an agreement to participate in that racketeering activity, must be dismissed for the same reason.

### 2. Failure to Allege Other RICO Elements under Rule 8(a)(2)

### a. Other Elements of § 1962(c)

There is at least one more reason why the complaint fails to sufficiently allege a violation of 18 U.S.C. § 1962(c): the complaint does not plead an enterprise. An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. An enterprise may be informal and need not have a rigid hierarchy or chain of command, but it should have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946-48 (2009). A "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest" is a RICO enterprise; a "run-of-the-mill-commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest" is not. *Bible*, 799 F.3d at 655-56 (finding that the plaintiff pled an enterprise where she "allege[d] a number of facts permitting the reasonable inference that … [the defendants] work[ed] as a

single enterprise."). Facts that have led the Seventh Circuit to conclude that the plaintiff has pled an enterprise include "an unusual degree of economic interdependence among the entities," *id*. at 656, and communication suggesting that that the entities do not manage their business separately but in fact work together, *id*. at 656'; *see United Food and Comm. Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854-55 (7th Cir. 2013) (finding no allegation that the defendants were working on behalf of an enterprise where no facts suggested "that officials from either company involved themselves in the affairs of the other.").

The Haddads' complaint does not allege facts that suggest anything more than run-of-the-mill commercial relationships between the Defendants in this case. The complaint does describe some of the relationships between the many defendants. *See* Compl. ¶ 2 at 3-¶ 15 at 4. But those relationships, though at times convoluted and many-layered, are just business-to-business relationships. There are no facts that suggest any of the Defendants function together as a single enterprise. The complaint insinuates that Wells Fargo proposed a refinance of the Haddads' mortgage because Option One knew about the Haddads' financial situation. Compl. ¶¶ 79-80 at 15 ("Option One was aware of the Plaintiffs financial difficulties … [a]s such, there was no coincidence that the Plaintiffs were targeted and solicited by the Enterprise for the making of Loan II"). But the fact that Wells Fargo reached out to the Haddads while they were falling behind on their mortgage does not necessarily suggest that Wells Fargo knew from Option One that they were struggling financially, much less

that Option One and Wells Fargo were operating as a single entity. The bottom line is that the complaint fails to allege the type of close relationships and purpose required for an enterprise.

The Defendants also argue that the Haddads have not alleged they were injured as a result of a RICO violation. Ocwen Br. at 19-20. The crux of the Defendants' argument is that the Haddads' distress could not have been caused by the 2006 refinance, because the refinance actually caused the Haddads' payments to go down. *Id*. It is not clear that comparing the payments immediately before and after the refinance is the right approach to take—the Haddads' claim is that they refinanced in 2006 to an adjustable-rate mortgage. Compl. ¶ 83 at 16. And they allege that after the interest rate adjusted in 2008, the total payment, including principal, interest, property taxes, and insurance, was $4,617.89. *Id*. ¶ 84 at 16. That amount is higher than even the Defendants' calculation of their pre-refinance payments, $4,332.28. *See* Ocwen Br. at 19.[9] So it is feasible that the refinance was a cause of the Haddads' hardship and stress. But the Court need not decide whether the Haddads have adequately pled that element of their RICO claims, because of the other grounds on which the RICO claims founder.

Even accepting the allegations in the complaint as true, the Haddads have not adequately pled an enterprise or a pattern of racketeering activity. So Count 1 must be dismissed on this alternative ground.

---

[9]The Court does not rely on the Defendants' numbers here for the reasons explained above at note 5.

### b. Agreement under § 1962(d)

Count 2 also fails to allege that any of the Defendants agreed with each other to violate RICO, as required under 18 U.S.C. § 1962(d). A conspiracy claim under 18 U.S.C. § 1962(d) "may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *DeGuelle*, 664 F.3d at 204 (cleaned up).

Because the complaint does not sufficiently allege an enterprise or pattern of racketeering activity, Count 2 is doomed to fail. But even if the complaint had successfully pled a substantive RICO violation in the first instance, it lacks allegations that lead to an inference of an agreement between any of the Defendants (with each other or with a distinct enterprise) to participate in a conspiracy "through the commission of two or more predicate crimes." *DeGuelle*, 664 F.3d at 204 The complaint alleges that the Defendants "conspired to originate Loan II, knowing it was bound to default and lead to foreclosure and created false documents to execute the Loan and foreclose." Compl. ¶ 2 at 39. It is unclear whether there are sufficient facts alleged to support the claim that the Defendants acted together in originating Loan II. But even if there were, to avoid *Rooker-Feldman*, the Defendants have acknowledged that the debt was valid and the foreclosure was proper. Pls. Resp. at 8. After that, there does not appear to be any agreement left, much less one to participate in an enterprise engaging in mail or wire fraud. The Haddads have failed to plead Count 2.

## D. State Law Claims

With Counts 1 and 2 dismissed, the remaining claims are the state law claims: civil conspiracy, intentional infliction of emotional distress, and loss of consortium. But now that the federal law claims have been dismissed, the usual presumption kicks in: "when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (*per curiam*) (citing cases). This presumption is expressed in 28 U.S.C. § 1367(c)(3), which provides for the discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction have been dismissed. Here, Counts 1 and 2 created federal-question jurisdiction, and the Haddads have not asserted diversity. Given that there is no basis for jurisdiction without Counts 1 and 2, there is no good reason to hang onto the state claims: there will be no statute of limitations bar because of Illinois's savings statute, 735 ILCS 5/13-217, the Court has not spent significant judicial resources on the state law claims, and it is not clear how they should be decided. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007). Because the federal claims have been dismissed, this Court also relinquishes supplemental jurisdiction over the state law claims.

## IV. Conclusion

For the reasons stated above, the RICO claims in the Plaintiffs' complaint are dismissed on statute of limitations grounds. Ordinarily, a plaintiff is permitted to submit an amended complaint after a first dismissal, but this dismissal is based on

the statute of limitations grounds (and, remember, the Haddads did not argue that they needed discovery to respond to that defense), so no amended complaint could fix the problem. In the alternative, the RICO claims also fail to state a claim under Rule 12(b)(6). Lastly, the Court relinquishes supplemental jurisdiction over the state law claims, so those claims are dismissed without prejudice to the Haddads' refiling of them in state court. The status hearing of April 26, 2019 is vacated. A separate judgment will be entered on the docket.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2019